IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HAROLD D. TENNISON, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil No.  13-199-CJP[1] |
| ) | |
| CAROLYN W. COLVIN, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Harold D. Tennison, Jr. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.  For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. §  405(g).

## PROCEDURAL HISTORY

Mr. Tennison applied for benefits in October 2009 alleging disability due to seizures and vertigo (Tr. 178).  He later alleged that peripheral neuropathy in both of his legs also contributed to his disability (*See* Tr. 203–10).  After holding an evidentiary hearing, Administrative Law Judge (ALJ) William Hafer denied the application for benefits in a decision dated June 6, 2011 (Tr.26–34).  Mr. Tennison's request for review was denied by the Appeals Council, and ALJ Hafer's decision became the final agency decision (Tr. 1).

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 14).

Mr. Tennison has exhausted his administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision.

## ISSUES RAISED BY PLAINTIFF

In his brief (Doc. 20), Tennison raises the following issues:

1. The ALJ improperly evaluated the opinion of the treating physician;

2. The ALJ failed to explain how the evidence supported his conclusion that Tennison could stand or walk for six out of eight hours;

3. The ALJ failed to address or include any limitations due to Tennison's ongoing vitamin deficiency;

4. The ALJ failed to properly consider Tennison's vertigo;

5. The ALJ erred in evaluating Tennison's credibility.

## APPLICABLE LEGAL STANDARDS

**A.     Disability Standard**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §§ 423(d)(3)

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For the purposes of this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

and 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

The Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the ALJ determines that the claimant is disabled or not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520(a)(4).

The first step considers whether the claimant is presently unemployed. 20 C.F.R. § 404.1520(a)(4)(i). If the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step. *Id.* The second step evaluates whether the claimant has an impairment or combination of impairments that is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). Again, if the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step. *Id.* The third step analyzes whether the claimant's severe impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If the answer is "yes," the claimant is automatically deemed disabled; if the answer is "no," the inquiry proceeds to the next step. *Id.*

Before continuing to the fourth step, the claimant's residual functional capacity ("RFC") is assessed. 20 C.F.R. § 404.1520(a)(4). The fourth step then assesses whether the claimant can perform past relevant work given his or her RFC. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is "yes," the claimant is not disabled and the inquiry is over; if the answer is "no," the inquiry proceeds to the next step. The fifth and final step assesses whether the claimant can perform other work given his or her RFC, age,

education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is "yes," the claimant is not disabled and the claim is denied. *Id.* On the other hand, if the answer is "no," the claimant is deemed disabled. *Id.*

**B.    Judicial Review**

The scope of judicial review of the Commissioner's decision is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, the Court must determine not whether Ewing was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence.")

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). In addition to supporting the decision with substantial evidence, the ALJ must also include an adequate discussion of the issues and "build an accurate and logical bridge" from the evidence to each conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008).

While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (listing cases). "If a decision lacks evidentiary support or is so poorly articulated as

to prevent meaningful review, a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.")

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Tennison in his complaint.

**A.   Background Information**

Harold Tennison, Jr. was born on May 24, 1958 and was 48 years old on the alleged onset date—May 1, 2007 (Tr. 174). He was 53 years old at the time of the evidentiary hearing in front of ALJ Hafer on May 26, 2011. Tennison was insured for DIB through June 30, 2012 (Tr. 28).[3]

He 5 feet, 10 inches tall and weighs approximately 150 pounds. He lives in Whittington, Illinois. He has a high school education, and prior to the alleged onset date, he worked as a bricklayer and mason.

**B.   Tennison's Disability Allegations & Agency Forms**

Tennison completed three Disability Reports during the administrative process, but he never submitted a Function Report (Tr. 177–84, 203–10, 215–20). His girlfriend, his sister, and his brother-in-law all filled out Seizure Description Forms (Tr. 193–95). Tennison also testified at an evidentiary hearing in front of ALJ Hafer on May 26, 2011 (Tr. 39–74). The following is a summary of Tennison's allegations regarding his disability as

---

[3] The date last insured is relevant only to the claim for DIB.

presented on the agency forms and at the evidentiary hearing.

Tennison listed his impairments as seizures, vertigo, and pain and numbness is his legs and feet. He claims that his impairments first interfered with his ability to work in March 2006, which is when he had his first seizure. He further claims that he stopped working on May 1, 2007 due to his impairments.

Tennison testified that he experienced frequent, severe seizures. His girlfriend, his sister, and his brother-in-law also indicated that he had more than one seizure per month. They stated that during a seizure, Tennison loses consciousness and falls down, his eyes roll back in his head, his body stiffens, he jerks and thrashes, and he drools. He is unconscious for 10 to 15 minutes. When he regains consciousness, he is disoriented and remains so for 30 minutes to an hour. Because of his seizures, Tennison cannot drive or operate machinery. He takes Keppra twice a day to control his seizures.

As a result of the anti-seizure medication, Tennison developed vertigo. He takes meclozine three times a day to treat the vertigo, but it is only partially effective and he still experiences dizziness and has trouble judging distances when he is walking. The vertigo affects his ability to work because it limits his ability to stand, walk, and lift. The pain and numbness in his legs and feet also affect his ability to stand and walk. Tennison testified that his legs feel like "fence posts" and he has no feeling in his skin (Tr. 64) He previously took Darvocet for the pain, but it was taken off the market. He no longer takes anything for pain because he cannot afford it.

According to Tennison, he can only walk 200 feet before he needs to sit down. He can only stand for 15 or 20 minutes at a time. He testified that he could not stand or walk for six hours in an eight-hour work day.

He spends most of his day sitting in the house and watching TV or reading. He lets

his dog out to play and sits at a picnic table while they run around. He still cooks but only using the microwave; he is afraid to use the stove because he might have a seizure while it is on. The vertigo prevents him from doing chores, going shopping, or leaving the house in general. He only leaves his house to go to the doctor, the pharmacy, or his attorney's office. He used to have hobbies, including hunting, fishing, artifact hunting, and mushroom hunting, but he is no longer able to do them. He is also no longer able to take showers, and he has to take baths, because the vertigo makes it difficult for him to stand, and he cannot close his eyes and look back (*See also*, Tr. 382).

**C.    Medical Records**

The majority of the medical records are from Tennison's primary doctor, William F. Hays, M.D. Over the course of a year and a half, Tennison saw Dr. Hays on at least 10 occasions for ongoing care and management of his diagnosed impairments, including epilepsy, sensorimotor neuropathy, vertigo, weakness, and vitamin deficiencies (Tr. 309–10, 318–20, 384–86, 418–20).[4]

Tennison saw Dr. William Hays for the first time in October 2009 after he suffered a seizure (Tr. 321–23). Dr. Hays noted that it was Tennison's first seizure in six months. Tennison also reported a history of vertigo, that his knees and feet felt like "someone is sticking a bunch of pins in them," and that he had trouble walking at times (Tr. 321–23). After examining Tennison, Dr. Hays noted that Tennison's motor strength, coordination, and gait were abnormal. His note was based on clinical findings that Tennison was unable to tandem walk and his Romberg test was "questionably negative" because he wobbled a

---

[4] Dr. Hays also referred to Tennison's epilepsy as a "seizure disorder" and "generalized convulsive epilepsy" (Tr. 318–20, 384–86). He initially referred to the pain and numbness in Tennison's legs as "posterior column signs" (Tr. 318–20, 321–23). He diagnosed Tennison's vertigo as "unspecified labyrinthitis" and "vestibular dizziness" (Tr. 418–20, 384–86).

lot, but never lost his balance (Tr. 321–23).

Dr. Hays ordered several diagnostic tests related to Tennison's "seizure disorder" and gait disturbance." An EEG showed "no focal slowing and no epileptiform activity" (Tr. 255). However, a CT scan of Tennison's head showed some abnormalities (Tr. 248–49). In particular, he had mild diffuse cerebral volume loss, but no acute intracranial hemorrhage or infarct, and probable dilation of the perivascular space in the inferior right basal ganglia (Tr. 248–49). Laboratory test results revealed that Tennison had a severe vitamin D deficiency and a vitamin B12 deficiency (Tr. 327–41). Later, a nerve conduction study ("NCS") on his legs revealed "moderate mixed sensorimotor peripheral neuropathy," as opposed to lumbosacral radiculopathy (Tr. 300–03). The doctor who performed the NCS indicated that the cause of Tennison's neuropathy was possibly metabolic, such as vitamin deficiencies or endocrine abnormalities, or hereditary.

Dr. Hays remarked more than once that Tennison's seizures were "isolated" and that he "used Keppra with good results" (Tr. 384–86, 418–20, 423–25). The evidence is mixed regarding Tennison's compliance with the Keppra (*See* Tr. 384–86, 418–20, 421, 423–25). Dr. Hays also remarked more than once that Tennison's vertigo was a "chronic problem" that occurred daily and remained unchanged, but "[r]elieving factors include medication" (Tr. 418–20, 423–25). Tennison's vitamin deficiencies were also characterized as a "chronic problem" (Tr. 384, 418, 423).

Prior to seeing Dr. Hays and during the entire course of treatment with Dr. Hays, Tennison took Keppra for his seizures and meclozine for his vertigo. Dr. Hays also prescribed vitamin B12 injections, a vitamin D supplement, and Darvocet to treat Tennison's leg pain (*See* Tr. 309, 385).

In June 2010, Dr. Hays referred Tennison to Southern Illinois Healthcare

Rehabilitation Services ("SIH") for a functional capacity evaluation (Tr. 423–25). A physical therapist at SIH, Mallori Cravens, performed a full evaluation in July 2010 (Tr. *See* 380–82). Pertinent to this Order, Ms. Cravens observed that Tennison had multiple postural and gait deviations—he stood with his right toe out and head and shoulders forward, and he walked with his right toe out, decreased cadence of step length bilaterally, decreased arm swing bilaterally, and he swayed side to side. Ms. Cravens noted that Tennison required frequent seated rest breaks during the evaluation, and therefore opined that he was capable of only occasional sitting and walking, and infrequent static standing. She also opined that he was capable of only occasional balancing or stopping, and infrequent kneeling, crouching, and crawling because he needed to use a chair to get in and out of each position. Ms. Cravens' overall impression based on her evaluation and Tennison's medical status was that "he would have significant difficulty tolerating competitive employment."

One week after the evaluation, Dr. Hays reviewed the results and opined that Tennison "cannot stand or walk more than 30–60 minutes at a time" (Tr. 384–86). Dr. Hays also noted that Tennison was unable to drive (Tr. 384–86). Consequently, Dr. Hays opined that "Patient not able to work at present. Do not see him returning to any gainful employment in near future" (Tr. 384–86).

Dr. Hays later wrote a letter dated August 9, 2010 (Tr. 388). The letter reads in its entirety:

> Please be advised that Harold Tennison has been my patient for nearly the past year with multiple problems, the most severe being a seizure disorder that precludes him from driving or carrying on any meaningful occupation.
>
> He has undergone [sic] disability evaluation on 07/08/10 which precluded all but the lightest workload for an occupation. He was noted to have difficulty at all levels. He also has persistent vertigo.

It is my opinion that Mr. Tennison is totally disabled from any occupation.

Treatment notes indicate that Tennison did not suffer another seizure until March 2011 (Tr. 421). Tennison sought medical treatment after the seizure and he was seen by Dr. Guy Joassin. Dr. Joassin noted upon physical examination that Tenison's gait and posture were normal; motor function in his legs was normal; muscle tone and mass were good; and there were no sensory, vascular, or neurological deficits (Tr. 421). Dr. Joassin did not indicate what his clinical findings were based on.

### D.     Evidence Not Before the ALJ

The transcript contains approximately 75 pages of medical records that were not part of the record at the time the ALJ issued his decision (*See* Tr. 35–38). These records appear in the transcript at pages 430–505 and were designated by the Appeals Council as Exhibit 12F through 16F. These records include: (1) treatment notes from Dr. Hays indicating that Tennison's condition continued to deteriorate in 2011; (2) imaging reports from Herrin Hospital revealing mild to moderate degenerative changes in Tennison's lumbar spine and a markedly fatty liver; and (3) records from Marion Eye Center from numerous visits and two surgeries for cataracts. These records were submitted to the Appeals Council, which considered them in connection with Tennison's request to review the ALJ's unfavorable decision (Tr. 5, 18). Because the Appeals Council eventually refused Tennison's request, it is not appropriate for the Court to consider evidence that was not before the ALJ. "Although technically a part of the administrative record, the additional evidence submitted to the Appeals Counsel cannot now be used as a basis for a finding of reversible error." *Rice v. Barnhart*, 384 F.3d 363, 366, n.2 (7th Cir. 2004); *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).

E.      **Consultative Examinstion**

There were no consultative physical examinations.

F.      **State Agency RFC Assessments**

In December 2009, before the nerve conduction study or the functional capacity evaluation were done, a state-agency physician assessed Tennison's physical RFC based upon a review of medical records (Tr, 291–98). The physician opined that Tennison was capable of work at the medium exertional level. Tennison had no other limitations, except a cautionary restriction to avoid concentrated exposure to hazards, such as machinery and heights.

Following the nerve conduction study in March 2010, but before the functional capacity evaluation in July 2010, a state-agency physician re-assessed Tennison's physical RFC based upon a review of medical records (Tr. 371–78). The physician opined that Tennison could only lift or carry 20 pounds occasionally and 10 pounds frequently. As a result of the increased limitation in lifting and carrying, Tennison was limited to work at the light exertional level. Tennison also had additional postural and environmental limitations, including that he should never climb ladders, ropes, or scaffolding, and should avoid even moderate exposure to hazards.

G.      **Vocational Expert's Testimony**

Following Tennison's testimony at the evidentiary hearing on May 26, 2011, a vocational expert (VE) testified (Tr. 67–72). The ALJ asked the VE a series of hypothetical questions. The first question required the VE to assume a person who was able to do work at the light exertional level, but limited to:

- Frequently stooping;
- Occasional kneeling, crouching, crawling, and climbing stairs;
- Never climbing ladders, ropes, of scaffolding; and
- Never working at unprotected heights or around dangerous machinery

(Tr. 69). The VE testified that this hypothetical person could not perform any of his past jobs, but there are unskilled occupations that exist in significant numbers in the local area that the person could perform, such as cashier II, office clerk, mail clerk, and laundry worker.

The VE further testified that the hypothetical person would be precluded from working at the unskilled, light level if:

- He could only stand or walk for 15 to 20 minutes at a time, and then needed to take a seated rest break for five minutes;
- He had a seizure on the job two or three times per month, and it took him from an hour to two hours to recover;
- He had dizziness and had to sit down for four hours of an eight-hour shift

(Tr. 70–72).

## THE DECISION OF THE ALJ

ALJ Hafer denied Tennison's claim on June 6, 2011 in a written decision (Tr. 26–34). The ALJ followed the five-step analytical framework outlined in 20 C.F.R. § 404.1520. At step one, the ALJ determined that Tennison had not engaged in substantial gainful activity since the alleged onset date (Tr. 28). The ALJ also found that Tennison is insured for DIB through June 30, 2012 (Tr. 28). At step two, the ALJ found that Tennison had a number of severe impairments, including seizure disorder, vertigo, status post-removal of anal fistula, sensorimotor neuropathy of the lower extremities, and hypertension (Tr. 28). At step three, the ALJ determined that Tennison's impairments did not meet or equal a listed impairment (Tr. 28–29).

The ALJ then concluded that Tennison had the residual functional capacity to

perform work at the light exertional level with some non-exertional limitations, including that he can never climb ladders, ropes, or scaffolding, never work at unprotected heights, and never work around dangerous machinery (Tr. 29). At steps four and five, based on the testimony of a vocational expert, the ALJ concluded that Tennison could not do his past work as a brick layer or mason, but he could perform other jobs which exist in significant numbers in the national and local economy, including as a cashier II, an office or mail clerk, and a laundry worker (Tr. 33). As a result, Tennison was not disabled.

## ANALYSIS

All of the issues raised by Tennison bear on the ALJ's RFC assessment that Tennison was capable of light work. Tennison's strongest argument is that, in assessing his RFC, the ALJ did not properly evaluate the opinion of his treating physician, William Hays, MD. The opinion of a treating physician generally is entitled to controlling weight if it is supported by medical findings and not inconsistent with other substantial evidence in the record. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)). If the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ "must offer 'good reasons' for declining to do so" and must determine what value the opinion merits in accordance with the federal regulations. *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010). *See also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection.")

The ALJ evaluated only one of Dr. Hays' opinions—the six-sentence letter dated August 9, 2010 opining that Tennison was totally disabled from any occupation—and determined that it was entitled to "little weight" (Tr. 32). The ALJ interpreted Dr. Hays' opinion to mean that Tennison was totally disabled due to his seizure disorder (*See* Tr.

32). The ALJ then found that this opinion conflicted with treatment notes indicating Tennison's seizures were isolated and well-controlled with medication, and he had "essentially negative" neurological exam three days after an alleged seizure (Tr. 32).

The ALJ's reasons for discounting Dr. Hays' opinion would be sound if the ALJ's interpretation of the opinion was accurate. However, it is clear that the ALJ misinterpreted Dr. Hays' opinion. As Tennison points out, Dr. Hays' opinion was actually that Tennison was totally disabled due to the combined effect of his multiple problems, including his seizure disorder, his vertigo, and his decreased functional capacity (*See* Tr. 388).[5] Because the ALJ did not accurately characterize Dr. Hays' opinion, his reasons for discounting that opinion are not sound. This matter must be remanded for reconsideration of Dr. Hays' August 2010 opinion.

The Court also wishes to note an additional problem with the RFC assessment—the ALJ either entirely ignored, or at a minimum failed to mention, two particularly critical pieces of medical evidence that contradict his conclusion that Tennison was capable of standing or walking for six hours in an eight-hour work day. In particular, the ALJ did not mention the July 2010 evaluation by physical therapist, Mallori Cravens (Tr. 381–83). The ALJ also failed to mention Ms. Cravens' opinion that Tennison was capable of only occasional sitting and walking, and infrequent static standing (Tr. 381–83). Likewise, the ALJ failed to mention Dr. Hays' July 2010 opinion, which was based in part on the results of Ms. Cravens' evaluation, that Tennison could not stand for more than 30 to 60 minutes (Tr. 385).

---

[5] Although the Court indicated that it would not consider evidence that was not before the ALJ, the Court thinks it is worth noting that a statement from Dr. Hays dated July 2011 further illustrates that he believed Tennison was disabled due to the combined effect of his multiple problems (*See* Tr. 430).

Page 14 of 17

Under the federal regulations, the ALJ was required to consider and weigh Dr. Hays' opinion. 20 C.F.R. § 404.1527(b), (c) ("[We] will always consider the medical opinions in your case record . . . [and] we will evaluate every medical opinion we receive.") On the other hand, the federal regulations do not require the ALJ to evaluate Ms. Cravens' opinion; however, the Social Security Administration has instructed that her opinion is nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects." Social Security Ruling 06-03P, 2006 WL 2329939, at *4–5, 6 (Aug. 9, 2006) ("S.S.R. 06-03P"); *see* 20 CFR §§ 404.1513(a) (explaining evidence from other medical sources "may" be used to show the severity of claimant's impairment and how it affects their ability to work). The Court thinks in this particular instance that it was necessary for the ALJ to consider Ms. Cravens' evaluation because it was the *only* comprehensive assessment of Tennison's functional capacity in the record, and it undermined the ALJ's RFC assessment and suggest that Tennison was not capable of light work. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012) ("Although an ALJ need not mention every snippet of evidence in the record . . . he may not ignore entire lines of contrary evidence."); 20 C.F.R. § 404.1545(a)(3) (""We will assess your residual functional capacity based on all of the relevant medical and other evidence.")

Accordingly, it was incumbent on the ALJ to determine what weight each opinion deserved in accordance with the factors listed in the federal regulations and explain why the state agency physician's opinion was more consistent with the evidence and deserved more weight. *See O'Connor-Spinner*, 627 F.3d at 621 ("An ALJ must explain why he does not credit evidence that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence."); S.S.R. 96–8P, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain

why the opinion was not adopted."); S.S.R. 06-03P, at *4 (explaining opinions from other medical sources should be evaluated using the same factors that apply to medical opinions from "acceptable medical sources").

If Ms. Cravens' or Dr. Hays' opinion had been credited, Tennison would have been limited to sedentary work and he would be found disabled as of his 50th birthday based on medical-vocational rule 201.14. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14. On remand, the ALJ should be sure to consider and properly evaluate these two critical pieces of evidence.

Because the Court has determined that remand is necessary, it need not address Tennison's remaining arguments. On remand, the ALJ's credibility determination will need a fresh look after a new evaluation of all the opinions from medical sources in the record. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Tennison is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Harold Tennison, Jr.'s application for social security disability benefits and supplemental security income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:**   July 2, 2014

                                        **s/ Clifford J. Proud**
                                        **CLIFFORD J. PROUD**
                                        **UNITED STATES MAGISTRATE JUDGE**